# In the United States District Court
# for the Southern District of Georgia
# Waycross Division

LIBERTY CORPORATE CAPITAL,     *
LTD., individually, and AMLIN    *
CORPORATE MEMBER, LTD.,    *
individually,    *
   *
      Plaintiffs,    *       CV 513-119
   *
      v.    *
   *
BHANU MANAGEMENT, INC. d/b/a    *
RELAX INN,    *
   *
      Defendant.    *

## ORDER

This is a declaratory judgment action arising out of an
insurance coverage dispute between Plaintiffs Liberty Corporate
Capital, Ltd. and Amlin Corporate Member, Ltd. ("Plaintiffs")
and Defendant Bhanu Management, Inc. ("Defendant"). Presently
before the Court is Plaintiffs' fully briefed Motion for Summary
Judgment. Dkt. No. 28; see also Dkt. Nos. 32, 36.

Upon due consideration, Plaintiffs' Motion for Summary
Judgment (dkt. no. 28) is **GRANTED** as to their claims set forth
in Counts I and II of the Complaint as well as to Defendant's

counterclaims.[1]  Defendant's counterclaims (dkt. no. 7) are **DISMISSED with prejudice** in their entirety.

BACKGROUND

Defendant is a Georgia corporation that operates a motel on leased property in Folkston, Georgia.  Dkt. No. 1, ¶ 5; Dkt. No. 28-5 (Statement of Undisputed Facts, hereinafter "SUF"), ¶ 1; Dkt. No. 32-1, p. 1.[2]  In addition to the motel, Defendant runs a restaurant on the property.  SUF, ¶ 2.

## I.   Risk Placement

Sometime prior to January 12, 2012, Defendant retained Strawn Insurance ("Strawn"), an independent retail agent, to procure insurance coverage for the property.  Id. at ¶ 3; see also Dkt. No. 1, ¶¶ 13-14; Dkt. No. 7, ¶¶ 13-14.  Strawn then contacted North Point Underwriters, Inc. ("North Point"), a coverholder, on Defendant's behalf.  SUF, ¶ 4.  A coverholder is authorized to underwrite risks for certain insurance companies and, subject to certain terms and conditions, can act on behalf of the insurer to bind it to insurance policies.  Id. at ¶ 5 & n.1.  In this case, North Point was authorized to underwrite

---

[1]  To the extent that Plaintiffs' Motion for Summary Judgment sought alternative relief under Count V, that relief is moot, given the grant of summary judgment as to Counts I and II.

[2]  While the parties have separately filed their statements of material facts, Defendant admits to all of the facts set forth in Plaintiffs' statement other than those in paragraphs 19, 44, 48, 49, and 55.  Dkt. No. 32-1.  Thus, while the Court cites only to Plaintiffs' statement as the "SUF" for ease of exposition, it should be presumed that any fact cited from this source is one in which Defendant joins, unless otherwise noted herein.

risks on behalf of Century Surety Company ("Century Surety") and Certain Underwriters at Lloyd's, London. Id. at ¶ 5. Through North Point, Century Surety issued Defendant a general liability and property policy (the "Century Surety Policy"), effective January 12, 2012. Id. at ¶ 6; see also Dkt. No. 1, ¶ 14; Dkt. No. 7, ¶ 14.

After the Century Surety Policy was issued, Defendant's property was inspected. SUF, ¶ 7. Based on the results of the inspection, North Point informed Strawn, in a letter dated March 28, 2012, that Defendant needed to complete five mandatory requirements for coverage to continue under the Century Surety Policy. Id. at ¶¶ 8-9. Specifically, the letter states, in relevant part, "The following recommendations are [m]andatory:" (1) "[t]he required annual servicing [and] tagging of the existing fire extinguishers is past due and should be immediately completed by a qualified fire extinguishing equipment contractor with annual service performed thereafter"; and (2) "[a] slip resistant mat should be placed at the front door to reduce the chance of customers slipping on entering the building." Dkt. No. 1-5, p. 2 (emphasis omitted).[3] The letter

---

[3] The other three mandatory requirements, which the parties agree are not at issue in this action, include the following: (1) "[a] qualified licensed siding contractor should be engaged to survey the siding and soffit and make necessary repairs or replacement"; (2) "[t]he tree branches on the south rear of the building should be trimmed away from the building"; and (3) "[o]ne ten[-]pound, (4A-60BC) UL-listed fire

AO 72A
(Rev. 8/82)

further demands that Defendant comply with the mandatory requirements within forty-five days. Id. ("Please note that we have marked our files for 45 days for a follow-up to make sure any mandatory recommendations have been completed.").

As the Century Surety Policy did not include coverage for wind or hail damage, Defendant sought this coverage from another insurance carrier. SUF, ¶ 10. Again working through North Point, Plaintiffs offered such coverage to Defendant through a short-term policy and issued a quote reflecting this offer on April 13, 2012. Id. at ¶ 11. Notably, the quote provides, "[W]ithin 30 days of binding[,] please provide written compliance with the 5 mandatory recommendations that were issued back in March 2012." Dkt. No. 1-6, p. 4. North Point transmitted the quote to Strawn on April 13, 2012, id. at p. 2, and Strawn, on that same day, sent Defendant an e-mail relaying the mandatory conditions of coverage and requesting written confirmation of compliance within two weeks, SUF, ¶ 13; see also dkt. no. 1-7 (Examination Under Oath, hereinafter "EUO"), 30:14–31:4. Defendant received Strawn's e-mail and understood that the five requirements were mandatory. SUF, ¶ 14. With the mutual understanding that Defendant would complete the mandatory

---

extinguisher[] should be provided for the housekeeping laundry room." Dkt. No. 1-5, p. 2; see also SUF, ¶ 8 & n.2.

AO 72A
(Rev. 8/82)

requirements, coverage was bound on April 13, 2012 (the "Short-Term Policy"). Id. at ¶ 15.

On May 1, 2012, North Point e-mailed Strawn to reiterate that coverage under the Short-Term Policy could not be continued without written confirmation of Defendant's compliance with the mandatory requirements. Id. at ¶ 16; see also Dkt. No. 1-8, p. 2. On May 3, 2012, Defendant notified Strawn via e-mail that it had completed all five of the mandatory requirements. SUF, ¶ 17. The e-mail states, in pertinent part, "Our property on U shapp [sic] so we have three walkway[s], every walkway ha[s] [a] [f]ire extinguisher in 3A-40-BC dry chemical with service tag[]. . . . . We all ready [sic] have a no slip restant [sic] mat at the front lobby door enternace [sic]." Dkt. No. 1-9, p. 3. Strawn indicated that it did not receive Defendant's e-mail, so Defendant resent the e-mail on June 8, 2012. Id. Strawn forwarded Defendant's e-mail to North Point upon receipt, and North Point delivered the same to Plaintiffs on June 11, 2012. Id. at p. 2.

Despite Defendant's representations to the contrary, Defendant admits that it had not completed the servicing and tagging of the fire extinguishers prior to sending the confirmation e-mail on May 3, 2012, and again on June 8, 2012. SUF, ¶ 21 (citing Dkt. No. 1, ¶¶ 30-31; Dkt. No. 7, ¶¶ 30-31; EUO, pp. 33-34). Although Defendant intended to have the fire

AO 72A
(Rev. 8/82)

extinguishers serviced and tagged in the future, Defendant later testified under oath that the equipment contractor whom it contacted had not actually come to do the work prior to that time. See id. at ¶¶ 21-22; EUO, 33:15-25. Further, Defendant testified that the equipment contractor never came at any time—even after Defendant sent and resent the confirmation e-mail—"because [Defendant] forgot . . . . . to call him again because he didn't show up after four or five weeks." EUO, 34:12-17. Thus, Defendant admits that "the fire extinguishers were not serviced or tagged at any time after March 28, 2012," and that it misrepresented its compliance with this requirement in its e-mail in May and June 2012. See SUF, ¶¶ 20, 24.

Coverage under the Short-Term Policy continued until its expiration on January 12, 2013. See id. at ¶ 29; Dkt. No. 1-6, p. 2. At that time, Plaintiffs renewed the Short-Term policy (the "Renewed Policy"), agreeing to provide commercial property and general liability coverage for an additional one-year period. SUF, ¶¶ 19, 28-29; Dkt. No. 32-1, ¶ 19. While Plaintiffs maintain that they opted to continue and renew the Short-Term Policy "[b]ased on the representation that the mandatory requirements were completed," SUF, ¶ 19, Defendant attempts to undermine this assertion by arguing that coverage was issued to Defendant despite Plaintiffs' knowledge that the

AO 72A
(Rev. 8/82)

fire extinguishers were not yet serviced and tagged, dkt. no.
32-1, ¶ 19.

Significantly, the issuing underwriter at North Point
testifies via affidavit that he "would have cancelled all
coverage" and "would not have renewed the policy if [he] had
known that the fire extinguishers were not serviced or tagged as
communicated." See SUF, ¶ 25; Dkt. No. 28-1 ("NP Aff."), ¶¶ 20-
21. In addition, North Point's underwriter attests that
"[h]ealth and safety are of the utmost importance when insuring
businesses in the hospitality class," including motels, and that
the servicing and tagging of fire extinguishers are requirements
of such coverage. NP Aff., ¶¶ 8, 17-18.

## II. Relevant Policy Terms

The Renewed Policy provides commercial and general
liability coverage to Defendant for the period of January 12,
2013, to January 12, 2014. SUF, ¶ 29; see also Dkt. Nos. 1-1 to
-2. Notably, the Renewed Policy lists various conditions to
coverage, including that a misrepresentation or concealment by
Defendant would render the policy void. SUF, ¶ 30. In
particular, the Renewed Policy contains the following provision
under the heading "Commercial Property Conditions":

A. Concealment, Misrepresentation or Fraud

> This Coverage Part is void in any case of fraud
> by you as it relates to this Coverage Part at any
> time. It is also void if you or any other

AO 72A
(Rev. 8/82)

> insured, at any time, intentionally conceal or
> misrepresent a material fact concerning:
>
> > 1. This Coverage Part;
> > 2. The Covered Property;
> > 3. Your interest in the Covered Property; or
> > 4. A claim under this Coverage Part.

Dkt. No. 1-2, p. 16 (emphasis omitted).

Additionally, the Renewed Policy contemplates replacement cost value coverage ("RCV") for the motel and actual cash value ("ACV") coverage for the restaurant. SUF, ¶ 31. Before Defendant may recover the RCV of any damaged property, however, the property must be repaired or replaced. Id. at ¶ 32. To that end, the Renewed Policy states:

> We will not pay on a replacement cost basis for any
> loss or damage:
>
> (1) Until the lost or damaged property is actually
> repaired or replaced; and
> (2) Unless the repairs or replacement are made as soon
> as reasonably possible after the loss or damage.

Dkt. No. 1-1, p. 21.

Lastly, the Renewed Policy includes a coinsurance provision, which means that if Defendant's property is insufficiently insured based on its value, Defendant's final recovery must be reduced according to a specific formula. SUF, ¶ 33. The coinsurance provision reads as follows:

> We will not pay the full amount of any loss if the
> value of Covered Property at the time of loss times
> the Coinsurance percentage shown for it in the
> Declarations is greater than the Limit of Insurance
> for the property.

AO 72A
(Rev. 8/82)

Instead, we will determine the most we will pay using
the following steps:

(1)  Multiply the value of Covered Property at the
time of loss by the Coinsurance percentage;
(2)  Divide the Limit of Insurance of the property by
the figure determined in Step (1);
(3)  Multiply the total amount of loss, before the
application of any deductible, by the figure
determined in Step (2);
(4)  Subtract the deductible from the figure
determined in Step (3).

We will pay the amount determined in Step (4) or the
limit of insurance, whichever is less. For the
remainder, you will either have to rely on other
insurance or absorb the loss yourself.

Dkt. No. 1-1, p. 19.

## III.  Loss and Adjustment Process

On February 21, 2013, around 7:00 PM, a fire broke out in
room 138 of the motel.  SUF, ¶ 34.  Defendant subsequently
notified Plaintiffs of the loss sustained from the fire, and
Plaintiffs retained Bridgewater Claims Services ("Bridgewater"),
an independent adjuster, to estimate the value of the damaged
property.  Id. at ¶ 37.

Upon inspecting the property, Bridgewater estimated that
the RCV of the damage to the motel was $503,628.03, and the ACV
of the restaurant's damage was $386.22.  Id. at ¶ 38; see also
Dkt. No. 1-10, pp. 65-66.  Bridgewater estimated that the RCV of
the motel in its entirety (if the motel was completely
destroyed) was $1,187,315.90, dkt. no. 1-10, p. 65, but the

AO 72A
(Rev. 8/82)

motel was only insured for $500,000, SUF, ¶ 40. Because the motel was insured for less than half of its value, Defendant concedes that the property was inadequately insured. SUF, ¶ 41. Moreover, because Defendant neither repaired nor replaced the damaged property, any recovery under the Renewed Policy would necessarily be limited to the ACV of the property. Id. at ¶ 42. Bridgewater estimated that the value of the restaurant in its entirety was $127,978.02, though this building was insured for $80,000. Id. at ¶ 43.

According to Plaintiffs, after factoring in depreciation and applying the coinsurance provision, Bridgewater concluded that Defendant's maximum recovery was $248,757.47 on an RCV basis for the motel and $301.79 on an ACV basis for the restaurant. Id. at ¶ 44. Defendant admits to this statement but nevertheless maintains that the statement mischaracterizes the conclusions of Bridgewater's estimate. Dkt. No. 32-1, ¶ 44. According to Defendant, because the parties agree that the ACV of the motel is the appropriate measure of damages available to Defendant, the coinsurance provision should be applied to Bridgewater's estimate of the ACV of this building to determine maximum recovery. Id. By Defendant's calculation, the maximum

AO 72A
(Rev. 8/82)

recovery available to Defendant for the motel is $336,119.36. Id.[4]

In addition, Defendant hired WorldClaim Global Claims Management ("WorldClaim") to serve as its public adjuster. SUF, ¶ 45; see also Dkt. No. 1, ¶ 60; Dkt. No. 7, ¶ 60. Pursuant to their contract, WorldClaim is entitled to receive five percent of any recovery that Defendant may obtain from Plaintiffs. SUF, ¶ 46; see also Dkt. No. 1-11. WorldClaim inspected the Defendant's property around the same time as Bridgewater, though WorldClaim estimated that the RCV of damage to the motel was $880,523.70 and that the RCV for the restaurant was $9,883.90. SUF, ¶ 47; see also Dkt. Nos. 1-3 to -4. Plaintiffs state that the WorldClaim estimate vastly exceeds Bridgewater's estimate as well as the policy limits. SUF, ¶ 48. Defendant maintains that Plaintiffs are comparing apples to oranges. Dkt. No. 32-1, ¶ 48. According to Defendant, WorldClaim's estimate demonstrates the amount that it would cost to repair and replace the damaged property, not the amount that was due and owing from Plaintiffs after applying all of the relevant coinsurance and deductible provisions, as done in Bridgewater's estimate. Id.

Importantly, all parties acknowledge that the WorldClaim estimate "includes rooms and items that did not incur fire

---

[4] [$500,000/($742,501.33(.8))]*$402,280.52 - $2,500 = $336,119.36. Dkt. No. 32-1, p. 2 n.1.

AO 72A
(Rev. 8/82)

damage and exaggerates the quality of goods needed to replace damaged property." SUF, ¶ 50. Defendant admitted under oath that although the WorldClaim estimate includes replacement costs relating to the roofs of the motel office and a connected canopy, these areas were not damaged by the fire. Id. at ¶ 51. Additionally, Defendant testified that costs are included in the WorldClaim estimate for repainting the pool, fixing the interior of room 115, replacing the carpet in room 109, and making changes to the manager's private office, though none of these areas or items incurred fire damage. Id.[5]

According to Defendant, the WorldClaim estimate also exaggerates the quality of the goods required to replace the damaged property as well as the time required to repair the property. Id. at ¶ 52. For example, the WorldClaim estimate lists replacement goods such as metal insulated/wood high-grade doors, high-grade sconces, light fixtures, tiles, and marble countertops, none of which were present on the property before the loss. Id. Defendant further acknowledged that the replacement cost of several rooms is too high; the amount of time allotted for cleaning the laundry room is too high (sixteen hours as opposed to the one hour that it actually took for Defendant to clean); and the cost and amount of time for

---

[5] The SUF contains a chart of these items, and the total amount of their replacement costs is $168,058. SUF, ¶ 51.

AO 72A
(Rev. 8/82)

commercial supervision of repair work (forty weeks) is unreasonable. Id. Given these misrepresentations, Defendant admitted under oath that the WorldClaim estimate "was not a fair characterization of its claims," id. at ¶ 53, and that it "understood why an insurance company would want to ask . . . questions" after receiving the WorldClaim estimate, dkt. no. 32-1, ¶ 55 (internal quotation marks omitted).[6]

In spite of its later point of view, Defendant, after receiving a copy of the WorldClaim estimate for its review, responded in an e-mail to WorldClaim dated April 1, 2013, stating, "You have our approval to move forward with this document." Dkt. No. 28-4, p. 2. Notably, Defendant approved the submission of the WorldClaim estimate to Plaintiffs without making any changes or alterations to it. SUF, ¶ 54. Defendant then demanded payment of its claim on September 26, 2013. Id. at ¶ 56.

Plaintiffs filed suit against Defendant in this Court on November 15, 2013. Dkt. No. 1. In Count I, Plaintiffs allege that they are entitled to rescind the Renewed Policy based on

---

[6] Defendant's briefs make reference to a deposition of Michael Fusco ("Fusco"), the owner of WorldClaim. See, e.g., Dkt. No. 32, p. 5. Apparently, Fusco expressed disagreement with Defendant's opinions regarding the WorldClaim estimate. See id. However, Defendant has neglected to submit the transcript of this deposition to the Court. Nevertheless, because Defendant's argument based on the Fusco deposition proves futile—even assuming that Fusco made the statements that Defendant says he did—the parties' decision not to submit the deposition into the record is of no consequence here.

Defendant's misrepresentations regarding its compliance with two of the mandatory requirements—namely, servicing and tagging all fire extinguishers and placing a slip-resistant mat at the entrance of the lobby. Id. at ¶¶ 101-10. In Count II, Plaintiffs claim that the Renewed Policy is void due to Defendant's misrepresentation of its damages in the adjustment of its claim. Id. at ¶¶ 111-20. On the basis of these claims, Plaintiffs seek a declaration that the Renewed Policy is void and that Plaintiffs have no liability and owe nothing to Defendant. Id. at ¶¶ 109-10, 117-19.

Plaintiffs plead Counts III through V in the alternative. See id. at ¶ 120. Plaintiffs' Counts III and IV allege that Defendant is barred from recovering proceeds under various provisions of the Renewed Policy, and seek a declaration that coverage is unavailable and that Plaintiffs owe nothing to Defendant. Id. at ¶¶ 121-35. In Count V, Plaintiffs assert that Defendant is not entitled to recover proceeds in the amount claimed, and request a determination of the amount of proceeds available to Defendant under the Renewed Policy. Id. at ¶¶ 136-45.

In response, Defendant brings two counterclaims: First, Defendant alleges breach of contract based on Plaintiffs' refusal to make payment, and seeks judgment in the amount of its insurance claim. Dkt. No. 7, ¶¶ 14-17, 22. Second, Defendant

AO 72A
(Rev. 8/82)

claims that Plaintiffs acted in bad faith in refusing to pay and, therefore, are liable to Defendant for an additional amount of damages as well as attorney's fees. Id. at ¶¶ 18-22.

## LEGAL STANDARD

Summary judgment is required where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute over such a fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. In making this determination, the court is to view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). To satisfy this burden, the movant must show the court that there is an absence of evidence to support the nonmoving party's case.

AO 72A
(Rev. 8/82)

Id. at 325. If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257.

The nonmovant may satisfy this burden in two ways: First, the nonmovant "may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993) (quoting Celotex Corp., 477 U.S. at 332 (Brennan, J., dissenting)). Second, the nonmovant "may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117. Where the nonmovant attempts to carry this burden instead with nothing more "than a repetition of his conclusional allegations, summary judgment for the defendants [is] not only proper but required." Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981) (citing Fed. R. Civ. P. 56(e)). Similarly, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of

AO 72A
(Rev. 8/82)

ruling on a motion for summary judgment." <u>Howard</u>, 572 F. App'x at 694-95 (quoting <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007)).

**DISCUSSION**

Plaintiffs now move for summary judgment on their claims seeking to avoid the Renewed Policy based on Defendant's misrepresentations regarding the servicing and tagging of its fire extinguishers as well as the adjustment of its claim. Dkt. No. 28, pp. 14-20. In the alternative, Plaintiffs request judgment in their favor as to the amount of any insurance proceeds to which Defendant may be entitled under the Renewed Policy. <u>Id.</u> at pp. 20-23. Plaintiffs also move for summary judgment on Defendant's counterclaims. <u>Id.</u> at pp. 24-25. Defendants have filed a Response urging the Court to deny Plaintiffs' Motion on all claims, dkt. no. 32, to which Plaintiffs have filed a Reply, dkt. no. 36.

I.  **Plaintiffs' Claim that the Policy Is Void Based on Defendant's Misrepresentation as to Mandatory Requirements (Count I)**

Pursuant to O.C.G.A. § 33-24-7 ("Section 33-24-7"), an insurer may rescind an insurance contract based on the insured's "[m]isrepresentations, omissions, concealment of facts, [or] incorrect statements" in its application or negotiations for an insurance policy if (1) they were fraudulent; (2) they were "[m]aterial either to the acceptance of the risk or to the hazard assumed by the insurer"; or (3) "[t]he insurer in good

faith would . . . not have issued the policy or contract . . . if the true facts had been known to the insurer as required either by the application for the policy or contract or otherwise." O.C.G.A. § 33-24-7(a), (b)(2)-(3); see also Am. Gen. Life Ins. Co. v. Schoenthal Family, LLC, 248 F.R.D. 298, 308-09 (N.D. Ga. 2008) (referring to Section 33-24-7 as "Georgia's insurance contract rescission statute"). An insurer seeking to avoid an insurance policy under Section 33-24-7 need only prove that the conditions under one of these three prongs are satisfied. Am. Gen. Life Ins. Co., 248 F.R.D. at 308-09 (citing Nappier v. Allstate Ins. Co., 766 F. Supp. 1166, 1168 (N.D. Ga. 1991), and Graphic Arts Mut. Ins. Co. v. Pritchett, 469 S.E.2d 199, 202 (Ga. Ct. App. 1995)). Plaintiffs rely on the second and third prongs in arguing that rescission of the Renewed Policy is mandated in this case.

To avoid a policy under either the second or third prong, "the insurer need only show that the representation was false and that it was material in that it changed the nature, extent, or character of the risk." Haugseth v. Cotton States Mut. Ins. Co., 386 S.E.2d 725, 726 (Ga. Ct. App. 1989) (citing O.C.G.A. § 33-24-7(b)). Notably, the insured "need not have knowledge of the falsity or act in bad faith for the insurer to deny coverage," so long as the misrepresentation of the insured is material. Pierce v. Allstate Ins. Co., No. 1:07-CV-0592-JOF,

AO 72A
(Rev. 8/82)

2008 WL 4372003, at *4 (N.D. Ga. Sept. 19, 2008) (citing Nappier v. Allstate Ins. Co., 961 F.2d 168, 170 (11th Cir. 1992)); see also Worley v. State Farm Mut. Auto Ins. Co., 432 S.E.2d 244, 247 (Ga. Ct. App. 1993) ("In order to prevail on summary judgment, the insurer need only show that the representation was objectively false, regardless of the subject belief of the insured, and that it was material to the extent it changed the nature, extent, or character of the risk." (citations omitted)).

A misrepresentation is material under Section 33-24-7 if it would influence a prudent insurer in deciding whether or not to assume the risk of providing coverage, or if it would cause a prudent insurer to fix a different amount of premium in the event that such risk is assumed. Pope v. Mercury Indem. Co. of Ga., 677 S.E.2d 693, 696–97 (Ga. Ct. App. 2009) (quoting Jackson Nat'l Life Ins. Co. v. Snead, 499 S.E.2d 173 (Ga. Ct. App. 1998)). Thus, "[r]ather than inquire into what a particular insurer would have done had it known of the insured's misrepresentation[,] . . . Georgia courts employ a reasonableness test, an objective standard of conduct against which to measure the effect of the insured's false declarations." Woods v. Indep. Fire Ins. Co., 749 F.2d 1493, 1497 (11th Cir. 1985). The issue of materiality "is a mixed question of law and fact that can be decided as a matter of law if reasonable minds could not differ on the question." Id. at

AO 72A
(Rev. 8/82)

1496 (quoting Long v. Ins. Co. of N. Am., 670 F.2d 930, 934 (10th Cir. 1982)).

In the instant matter, the undisputed evidence indicates that Defendant misrepresented its compliance with the five mandatory requirements for coverage during the negotiation process. See Pope, 677 S.E.2d at 697 (stating that "negotiations" include "[a]ny verbal or written representations of facts by the assured to induce the acceptance of the risk" (quoting Marchant v. Travelers Indem. Co. of Illinois, 650 S.E.2d 316, 319 (Ga. Ct. App. 2007))). Indeed, Defendant provided written confirmation to Strawn via e-mail, both on May 3, 2012, and again on June 8, 2012, that it had completed all five of the mandatory requirements, including that "every walkway ha[d] [a] [f]ire extinguisher . . . with a service tag[]." Dkt. No. 1-9, p. 3. Defendant later admitted under oath that not only were the fire extinguishers not serviced and tagged on those dates, but that they were never serviced and tagged at any time after March 28, 2012. SUF, ¶¶ 20-21 (citing Dkt. No. 1, ¶¶ 30-31; Dkt. No. 7, ¶¶ 30-31; EUO, pp. 33-34). While perhaps Defendant intended to have the fire extinguishers serviced and tagged in the future, the fact remains that Defendant had not done so at the time of sending these e-mails, rendering these representations indisputably false. See id. at

AO 72A
(Rev. 8/82)

¶ 24 (stating that Defendant admits to having misrepresented its compliance with this requirement).

In addition, the record reflects that Defendant's misrepresentation regarding this mandatory condition was material.

In Pope, a Georgia Court of Appeals case, the insureds agreed to remove a diving board from their property as a condition to homeowner's insurance coverage, and did, in fact, do so, though only to later reinstall the same after the policy was reinstated. 677 S.E.2d at 695-96. After the insureds' property was damaged in a tornado, the insurer learned of the reinstalled diving board and filed suit to rescind the insurance policy on this basis. Id. at 696. The Georgia Court of Appeals affirmed the grant of summary judgment in favor of the insurer, because the insureds' misrepresentation—namely, that they had permanently removed the diving board—was material to the insurer's decision to accept the risk of insuring them. Id. at 697. The court found the following evidence sufficient to establish materiality: (1) the fact that the insurer agreed to reinstate the policy only after receiving proof of the diving board's removal; (2) the director of underwriting's sworn statement that coverage was not provided to homeowners with diving boards due to the high risk of injury associated therewith; and (3) the director of underwriting's testimony that

AO 72A
(Rev. 8/82)

he would not have reinstated the policy had the insureds not removed the diving board or had he known of their plan to reinstall the same. Id. The court noted, "Where the evidence shows that the insurer would not have issued the policy if it had been aware of [the true facts], the evidence demands a finding that the omissions or misrepresentations were material to the acceptance of the risk." Id. (alteration in original) (quoting Miller v. Nationwide Ins. Co., 415 S.E.2d 700 (Ga. Ct. App. 1992)).

Like the insureds in Pope, Defendant's misrepresentation related to its compliance with mandatory conditions to coverage. In addition, the evidence demonstrates that Plaintiffs made clear, through their communications both before and after the binding of the Short-Term Policy, that their acceptance of the risk of providing coverage to Defendant was dependent upon its compliance with the five requirements, including the requirement pertaining to its fire extinguishers. Dkt. No. 1-5, p. 2 (listing these requirements in the letter dated March 28, 2012); Dkt. No. 1-6, p. 4 (listing these requirements in the quote dated April 13, 2012); Dkt. No. 1-8, p. 2 (reiterating that coverage could not continue without written confirmation of Defendant's compliance with these requirements). In fact, Defendant admits to having understood that these requirements were mandatory, and that the parties bound coverage under the

AO 72A
(Rev. 8/82)

Short-Term Policy with the mutual understanding that Defendant would complete these requirements. SUF, ¶¶ 14-15.

Moreover, Plaintiffs have submitted the affidavit of North Point's issuing underwriter suggesting that North Point, and thus Plaintiffs, ordinarily would not insure a motel that does not satisfy this requirement, because "[h]ealth and safety are of the utmost importance when insuring businesses in the hospitality class." NP Aff., ¶¶ 8, 17-18. North Point's underwriter further attests that he, in fact, "would have cancelled all coverage" and "would not have renewed the policy if [he] had known that the fire extinguishers were not serviced or tagged as communicated." Id. at ¶¶ 20-21.

Notwithstanding this evidence, Defendants argue that the issue of materiality should be submitted to a jury, because Plaintiffs bound coverage under the Short-Term Policy on April 13, 2012, despite not knowing if Defendant had complied with the mandatory conditions at that time. Dkt. No. 32, pp. 7-8. However, Defendants overlook that North Point, on behalf of Plaintiffs, did so with the understanding that coverage would continue under the Short-Term Policy only if Defendant complied with the express conditions within the designated time frame. See SUF, ¶ 14. Moreover, North Point's e-mail dated May 1, 2012, reminded Strawn that continued coverage was dependent upon Defendant's written confirmation of compliance, and neither

AO 72A
(Rev. 8/82)

North Point nor Plaintiffs cancelled the Short-Term Policy before receiving Defendant's confirmation e-mail on June 8 and 11, 2012, respectively, suggesting that North Point and Plaintiffs evaluated the prospect of continued coverage after Defendant's misrepresentations occurred. See Dkt. No. 1-8, p. 2; Dkt. No. 1-9, p. 3.

In any event, it is undisputed that Plaintiffs decided to renew the Short-Term Policy and issue the Renewed Policy on January 12, 2013—long after Defendant misrepresented its compliance with the mandatory conditions—and that this was the policy in place when the fire occurred. See SUF, ¶¶ 29, 34. As such, Defendant fails to raise any genuine question of fact as to the materiality of its misrepresentation to Plaintiffs' decision to insure Defendant under the Renewed Policy. See Am. Gen. Life. Ins. Co., 248 F.R.D. at 312 ("Under Georgia law, 'the uncontradicted affidavit of the insurer that it would not have issued the policy in question had it known the truth . . . precludes any genuine issue of fact.'" (quoting Graphic Arts Mut. Ins. Co., 469 S.E.2d at 202)); see, e.g., Nappier, 961 F.2d at 170 (finding that no genuine issue remained as to the applicability of Section 33-24-7, because the insurer offered the affidavit of its underwriting manager testifying that it would not have agreed to provide coverage had it known the true

AO 72A
(Rev. 8/82)

facts regarding the conditions of the insureds, and the insureds "did not offer any evidence to contradict [this] proof").

Thus, the uncontroverted evidence, like that in <u>Pope</u>, demonstrates not only that a prudent insurer would be influenced by Defendant's misrepresentation of its compliance with the mandatory conditions, but also that the insurer in this case, in fact, would not have issued the Renewed Policy had it known that Defendant's statements were false. Under such circumstances, the evidence is sufficient for the Court to conclude that Defendant's misrepresentations were material as a matter of law. Plaintiffs thus have sustained their burden of proving that rescission of the Renewed Policy is proper under either the second or third prong of Section 33-24-7, and, therefore, summary judgment is **GRANTED** in their favor on Count I.

## II. Plaintiffs' Claim that the Policy Is Void Based on Defendant's Misrepresentations in the Adjustment (Count II)

Although Defendant's misrepresentation as to its compliance with the mandatory requirements during the placement of the risk is sufficient to void the Renewed Policy, the Court addresses Defendant's misrepresentations in the adjustment as an additional or alternative ground to support this result.

Under a misrepresentation clause, like that here, "a willful and intentional misrepresentation of material facts made for the purpose of defrauding the insurer will void the

contract." <u>Perry v. State Farm Fire & Cas. Co.</u>, 734 F.2d 1441, 1443 (11th Cir. 1984) (citing <u>Am. Alliance Ins. Co. v. Pyle</u>, 8 S.E.2d 154, 160 (Ga. Ct. App. 140)).  "A misrepresentation is material if it 'might affect [the insurer's] action in respect to . . . settlement or adjustment of the claim of the insured.'" <u>Id.</u> (alterations in original) (quoting <u>Am. Alliance Ins. Co.</u>, 8 S.E.2d at 160).  The insurer, however, "need not actually rely on the representation or suffer any prejudice therefrom." <u>Id.</u> (citing <u>Pittman v. Am. Mut. Fire Ins. Co.</u>, 199 S.E.2d 893 (Ga. Ct. App. 1973)).  "Whether a misrepresentation is material is a jury question, unless the evidence excludes every reasonable inference except that there was or was not a material misrepresentation." <u>Id.</u> at 1444 (citing <u>United Family Life Ins. Co. v. Shirley</u>, 248 S.E.2d 635, 636 (Ga. 1978)).

Here, the Renewed Policy provides that a misrepresentation or concealment by Defendant would render the policy void:

A. Concealment, Misrepresentation or Fraud

> This Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at any time.  It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:
>
> 1. This Coverage Part;
> 2. The Covered Property;
> 3. Your interest in the Covered Property; or
> 4. A claim under this Coverage Part.

AO 72A
(Rev. 8/82)

Dkt. No. 1-2, p. 16 (emphasis omitted).

Nevertheless, the record reflects that Defendant vastly misrepresented the amount of its insurance claim. Defendant admits that the WorldClaim estimate "includes rooms and items that did not incur fire damage and exaggerates the quality of goods needed to replace damaged property." SUF, ¶ 50. Specifically, Defendant concedes that the WorldClaim estimate includes the following items, none of which sustained damaged in the fire, amounting to $168,058 in repairs: the roof of the motel office, the roof of a connected canopy, the paint in the pool, the interior of room 115, the carpet in room 109, and the manager's private office. Id. at ¶ 51. Defendant also acknowledges that the WorldClaim estimate lists several costly goods as replacements, though none of these were present on the property before the incident: metal insulated/wood high-grade doors, high-grade sconces, light fixtures, tiles, and marble countertops. Id. at ¶ 52. Even further, Defendant admits that the replacement cost of several rooms is too high; the amount of time allotted for cleaning the laundry room is too high; and the cost and amount of time for commercial supervision of repair work (forty weeks) is unreasonable. Id. Although it was plain that the WorldClaim estimate "was not a fair characterization of its claims," Defendant approved the submission of the estimate to Plaintiffs without making any changes or alterations and

AO 72A
(Rev. 8/82)

later demanded payment in the claimed amount. Id. at ¶¶ 53-54, 56.

Defendant's argument that the admittedly inflated values in its claim do not constitute misrepresentations is unavailing. See Dkt. No. 32, pp. 8-10. Defendant cites Assurance Co. of America v. Defoor Station, LLC, No. 1:09-CV-3198-TWT, 2011 WL 5598900, at *3 (N.D. Ga. Nov. 15, 2011), for the proposition that claiming replacement units of higher quality than damaged goods is not a misrepresentation. Dkt. No. 32, pp. 9-10. However, Defendant fails to distinguish the court's finding in that case that the insured—like Defendant—had also claimed losses that were not actually sustained, and that these losses constituted material misrepresentations affecting the insurer's adjustment of the claim. Defoor Station, LLC, 2011 WL 5598900, at *4-5. Likewise, Defendant cites the deposition testimony of Fusco opining that the WorldClaim estimate does not misrepresent the damage to Defendant's property, because the roof was damaged by smoke; the metal insulated doors are required by building codes; and the rooms contained what he considers to be high-grade wall sconces. Dkt. No. 32, p. 10. Notwithstanding Defendant's failure to attach the Fusco deposition in support of its brief, Fusco's statements—even if true—again pertain only to Defendant's overvaluation of replacement goods, not its claiming of damages that were never sustained in the first place.

AO 72A
(Rev. 8/82)

Thus, even assuming, _arguendo_, that <u>Defoor Station</u> and Fusco's testimony support finding that Defendant did not misrepresent the value of replacement goods, Defendant falsely claimed proceeds for several rooms and items not damaged in the fire, and those misrepresentations alone are sufficient to carry Plaintiffs' claim, as discussed below. See <u>Defoor Station, LLC</u>, 2011 WL 5598900, at *4-5 ("Indeed, by misrepresenting the existence of the exterior HVAC units, and claiming those units were stolen, the [insureds] misrepresented the amount of the loss."); <u>Perspolis, Inc. v. Federated Mut. Ins. Co.</u>, No. Civ.A.1:03CV2456-JEC, 2006 WL 826469, at *1-2 (N.D. Ga. Mar. 28, 2006) ("[T]he [c]ourt noted [the insured's] admission that it had inadvertently failed to remove some of the inventory not stolen from the list of inventory submitted on the proof of loss as having been stolen. . . . . [The insured] intentionally misrepresented a material fact—the amount lost—in its claim.").

Additionally, it appears that Defendant's misrepresentations of the extent of its losses were material to the adjustment of the claim. See <u>Perry</u>, 734 F.2d at 1443 ("A misrepresentation is material if it 'might affect [the insurer's] action in respect to . . . settlement or adjustment of the claim of the insured.'" (alterations in original) (quoting <u>Am. Alliance Ins. Co.</u>, 8 S.E.2d at 160)). Here, knowledge that several of the rooms and items listed in the

AO 72A
(Rev. 8/82)

WorldClaim estimate were not actually damaged, and thus did not actually require $168,058 in repairs, would undeniably affect Plaintiffs' adjustment of Defendant's insurance claim. Moreover, because the amount of Defendant's loss in the fire is the amount that Plaintiffs would need to pay if the Renewed Policy were not void, the misrepresentation of this fact is material as a matter of law. See Perspolis, Inc., 2006 WL 826469, at *2 ("The amount lost in a burglary is a material fact, as that is the amount the insurance company-defendant is obligated to pay unless there is some reason to void the policy." (citing Woods, 749 F.2d at 1496)).

Further, it appears that Defendant's misrepresentations of its property damage were willful, intentional, and intended to defraud Plaintiffs. "An intent to defraud can be inferred when the misrepresentation is made willfully and intentionally." Fiveash v. Allstate Ins. Co., 603 F. App'x 773, 775 (11th Cir. 2015). In other words, "[t]here must be a willful intent to defraud rather than an innocent mistake." Id. at 776 (citing Watertown Fire Ins. Co. v. Grehan, 74 Ga. 642, 656–57 (1885)).

The record reflects that Defendant acted willfully and intentionally in misrepresenting its losses, as Defendant was provided with a copy of the WorldClaim estimate containing the patent falsities, to review prior to its submission. See Dkt. No. 28-4, p. 2. The record further shows that Defendant,

without making any changes or alterations or otherwise raising any issue as to the contents of the estimate, SUF, ¶ 54, expressly directed WorldClaim to submit the estimate to Plaintiffs, dkt. no. 28-4, p. 2. Defendant later demanded payment of the claimed proceeds, again without mentioning that the claimed amounts were improperly inflated. SUF, ¶ 56.

While Defendant does not dispute these facts, it nevertheless insists that the facts are not indicative of fraudulent intent, citing the fact that it apologized for the overinclusiveness of the claimed damages during its examination under oath. See Dkt. No. 32, pp. 10-11. However, Defendant's remorse after the fact is irrelevant to its knowledge and intent when the events in question occurred. Moreover, Defendant does not point to any other facts or evidence to contradict Plaintiffs' submissions or otherwise suggest that Defendant acted innocently in submitting the insurance claim containing material misrepresentations. Accordingly, Defendant fails to demonstrate that any genuine issue of material fact exists as to its state of mind at the relevant time.

The undisputed facts—in particular, the numerous falsities appearing on the face of the WorldClaim estimate, as well as Defendant's own conduct in approving of and demanding recompense for the same—overwhelmingly demonstrate that Defendant acted willfully, intentionally, and with the intent to defraud

AO 72A
(Rev. 8/82)

Plaintiffs during the adjustment of the claim. See Defoor Station, LLC, 2011 WL 5598900, at *5 (finding that the insured violated the policy's "concealment, misrepresentation or fraud" provision by including items in its claim for stolen property that were not, in fact, stolen); Pierce, 2008 WL 4372003, at *8 (holding that the insurance policy was void where the insured misrepresented the value of goods lost in a fire); Perspolis, 2006 WL 826469, at *1-2 (finding that the insured violated the "concealment, misrepresentation or fraud" provision of the insurance contract, where the insured admitted to "inadvertently fail[ing] to remove" some items that were not stolen from its claim for proceeds following a burglary).

Thus, Defendant's misrepresentations during the claim adjustment process violated the Renewed Policy's misrepresentation provision and, as such, provide an additional, or alternative, basis upon which to conclude that the policy is void. Accordingly, Plaintiffs' Motion for Summary Judgment on Count II (dkt. no. 28) is **GRANTED**.

**III. Plaintiffs' Remaining Claims (Counts III through V)**

Because the Court finds in Plaintiffs' favor on their claims in Counts I and II, the Court need not consider the merits of their alternative claims for relief set forth in Counts III through V. To the extent that Plaintiffs' Motion for Summary Judgment contains arguments, in the alternative,

AO 72A
(Rev. 8/82)

relating to their amount-of-loss claim in Count V, this portion of Plaintiffs' Motion (dkt. no. 28) is **DISMISSED as moot.**

## IV. Defendant's Counterclaims for Breach of Contract (Count I) and Bad Faith Failure to Pay (Count II)

Having determined that the overwhelming evidence supports a finding that the Renewed Policy is void, Defendant's counterclaims concerning that policy—namely, that Plaintiffs breached the policy and acted in bad faith in failing to pay a claim due thereunder—must fail. See Perspolis, Inc., 2006 WL 826469, at \*2 ("[The insurer] properly invoked the "concealment, misrepresentation or fraud" provision. [The **insurer**], therefore, did not breach the insurance contract."); see also Defoor Station, LLC, 2011 WL 5598900, at \*5 ("[The insurer] was justified in disputing the claim under the "Concealment, Misrepresentation or Fraud" provision of the [p]olicy. For this reason, the [insureds'] counterclaim for bad faith is dismissed."). Consequently, Plaintiffs' Motion for Summary Judgment on Defendant's counterclaims (dkt. no. 28) is **GRANTED**, and Defendants' counterclaims (dkt. no. 7) are hereby **DISMISSED with prejudice.**

## CONCLUSION

Based on the foregoing, Plaintiffs' Motion for Summary Judgment (dkt. no. 28) is **GRANTED** as to their claims set forth in Counts I and II of the Compliant as well as to Defendant's

counterclaims.[7] The Court hereby finds that the Renewed Policy is void and that Plaintiffs, therefore, have no liability or obligations to Defendant thereunder. Defendant's counterclaims (dkt. no. 7) are hereby **DISMISSED with prejudice.**

The Clerk of Court is **DIRECTED** to enter an appropriate judgment and to close this case.

**SO ORDERED**, this 30TH day of September, 2015.


LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

---

[7] To the extent that Plaintiffs' Motion for Summary Judgment sought alternative relief under Count V, that relief is moot, given the grant of summary judgment as to Counts I and II.

AO 72A
(Rev. 8/82)